UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
P.S., et al.,                                               :
                                          Plaintiffs,       :
                                                            :          13 Civ. 04772 (LGS)
                      -against-                             :
                                                            :          ORDER AND OPINION
NEW YORK CITY DEPARTMENT OF                                 :
EDUCATION,                                                  :
                                          Defendant.        :
                                                            :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Plaintiffs P.S. and K.S., individually and on behalf of their child, M.S., bring this action

against the New York City Department of Education ("DOE") pursuant to the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  Plaintiffs seek review of the April

22, 2013, decision of the New York State Review Officer ("SRO Decision") reversing the July

23, 2012, decision of the Impartial Hearing Officer ("IHO Decision"), which found that the DOE

had failed to provide a free and appropriate education ("FAPE") to M.S. during the 2011-2012

school year.  The parties have cross-moved for summary judgment.  Because the SRO's reversal

of the IHO's decision is sufficiently supported by the record, Plaintiffs' motion is denied and the

DOE's motion is granted.

## I.      STATUTORY FRAMEWORK

        The IDEA mandates that states receiving federal special education funding provide

disabled children with a FAPE.  20 U.S.C. § 1412(a)(1)(A); *M.W. ex rel. S.W. v. New York City

Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).  "To ensure that qualifying children receive a

FAPE, a school district must create an individualized education program ('IEP') for each such

child." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  An IEP is a

1

written statement that "'describes the specially designed instruction and services that will enable the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child." *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175); *see* 20 U.S.C. § 1414(d).

New York delegates the development of an IEP to a local Committee on Special Education ("CSE"). *See* N.Y. Educ. Law § 4402(1)(b)(1) (McKinney). At a minimum, the CSE is composed of the student's parent(s), a special education teacher, a regular education teacher if the student participates in a regular education program, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician and a parent of another student with a disability. *See* Educ. § 4402(1)(b)(1)(a). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175.

If a parent believes that the DOE has failed to provide a FAPE to his or her child, the parent may "unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W.*, 725 F.3d at 135 (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10, 16 (1993)). To seek reimbursement, the parent must first file a due process complaint with the DOE, which triggers administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer ("IHO"). *See M.W.*, 725 F.3d at 135 (citing 20 U.S.C. §§ 1415(b)(6), (f); Educ. § 4404(1)). The IHO hearing is governed by the three-part *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c): "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W.*, 725 F.3d at 135 (footnote

omitted).

The IHO's decision may be appealed to a State Review Officer ("SRO").  *See* Educ.
§ 4404(2); *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012) (citing *Grim
v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379-80 (2d Cir. 2003)).  The SRO's decision is the
final administrative decision.  An aggrieved party, however, may seek review of the SRO's
decision by commencing an action in federal district court.  *See* 20 U.S.C. § 1415(i)(2)(A); *M.W.*,
725 F.3d at 135-36.

## II.     BACKGROUND

### A.      M.S.'s Educational History

M.S. is a 14-year-old boy with autism spectrum disorder.  M.S. presents with maladaptive
behaviors such as tantrums, verbal perseveration, non-contextual laughing, refusal to follow adult
orders and self-injurious behaviors.  At the time of the most recent test available in the record, at
age eleven years, seven months, the receptive skills of M.S. corresponded to an age equivalency
of three years, four months; his expressive language skills corresponded to an age equivalency of
below three years; and his reading and writing skills corresponded to an age equivalency of six
years, ten months.

For the ten years prior to the 2011-2012 school year at issue here, M.S. attended the
McCarton School ("McCarton").  McCarton is a not-for-profit school that educates children and
young adults with autism spectrum disorder using a combination of Applied Behavior Analysis
("ABA") and speech, language and occupational therapy, often in a one-on-one teacher-student
setting.

### B.      M.S.'s Individualized Education Program for 2011-2012

On May 16, 2011, the DOE convened a meeting of the CSE to develop M.S.'s IEP for the 2011-2012 school year.  The CSE consisted of M.S.'s mother, K.S., a district special education teacher, a district social worker, a district school psychologist, a parent member, M.S.'s head-classroom teacher at McCarton, M.S.'s board-certified behavior analyst from McCarton, M.S.'s occupational therapist from McCarton, and M.S.'s speech and language therapist from McCarton.

The CSE considered various reports generated by McCarton in evaluating M.S.'s behavior and needs, including a Speech and Language Department Progress Report dated December 2010, an Occupational Therapy Progress Report dated January 2011, an Educational Progress Report dated January 2011 and proposed IEP goals for M.S. for the 2010-2011 school year.  The CSE also considered an observation report conducted by the district's school psychologist in December 2010.  M.S.'s McCarton teachers and his mother also provided input on M.S.'s needs, including his need for one-on-one speech and language therapy and occupational therapy.  The CSE discussed M.S.'s behaviors, including tantrumming, "aggressing and some self-injuries [sic] behaviors," and the tendency to "get[ ] very upset when things do not go according to plan or the way he expects."  The CSE determined that M.S.'s needs could be met by placing him in a class with six students, one special education teacher and a behavior management paraprofessional devoted exclusively to M.S. (a "6:1:1 class").

After the meeting, the CSE completed an IEP for M.S.  The IEP, also dated May 16, 2011, addressed different aspects of M.S.'s performance, including academic performance, social and emotional performance and health and physical development.  As to M.S.'s academic performance, the IEP noted that M.S. required a "highly structured, predictable learning environment, clear and consistent expectations and routines, consistent positive reinforcement schedule (i.e. token system) [and] tasks broken down into small steps . . . ."  In addressing M.S.'s

social and emotional performance, the IEP recorded that M.S. could "quickly grow non-compliant," "coping with the unexpected [was] difficult," and M.S. engaged in tantrums which "can progress to aggression." The IEP concluded that M.S.'s behavior "seriously interferes with instruction and requires additional support." As to M.S.'s health and physical development, the IEP noted that M.S. was in "overall good health" but "continue[d] to have difficulty with sensory processing skills" as well as organization, self-regulation and gross motor skills. The IEP recommended a "special class environment" for M.S., observing that he "require[d] intensive adult support in a small class setting to meet IEP goals."

The IEP did not include a functional behavior assessment ("FBA").[1] The IEP did, however, include a Behavior Intervention Plan ("BIP").[2] The BIP identified the behaviors that impaired M.S.'s ability to learn effectively, including "non-compliant behavior [such as] laughing and verbal perseveration, throwing/destroying materials, lack of attention to task, non-contextual vocalization and dropping to the floor, [and] tantrumming." It set forth objectives to change those behaviors, as well as strategies and supports to assist in achieving the asserted objectives. The recommended strategies and supports included a behavior management paraprofessional, a small class setting, a special education teacher, "related service providers," collaboration between the home and school and a rewards system.

---

[1] An FBA is "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment," N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(r), which "shall include, but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(r).

[2] A BIP is "a plan that is based on the results of a [FBA] and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(mmm).

In accordance with the recommendations made at the CSE meeting and in the BIP, the IEP proposed that M.S. be placed in a special class in a specialized school, with a 6:1 student-teacher ratio, for a twelve-month school year.  In addition, the IEP proposed a 1:1 behavior management paraprofessional, adaptive physical education, occupational therapy (two forty-five minute sessions per week with a 2:1 student-therapist ratio), and speech and language therapy (five sixty-minute sessions per week with a 1:1 student-therapist ratio, one forty-five minute session per week with a 5:1 student-therapist ratio, and one forty-five minute session per week with a 2:1 student-therapist ratio).  The IEP did not recommend a particular school where M.S. would be placed.

### C.      Rejection of the Recommended School Placement

On May 30, 2011, M.S.'s mother enrolled him at McCarton for the 2011-2012 school year.  On June 15, 2011, M.S.'s parents notified the DOE that they had not received a copy of M.S.'s IEP or a recommended school placement and that they intended to enroll M.S. at McCarton if they did not receive a recommended placement.  On an unspecified date thereafter, M.S.'s parents received notification from the DOE, dated June 14, 2011, offering placement at the Horan School in Manhattan for the 2011-2012 school year, but did not receive M.S.'s IEP.  On June 21, 2011, M.S.'s mother visited the Horan School.  The Horan School does not use ABA methodology.  M.S. was to be placed in the class of Ms. Sencion, a special education teacher with a master's degree in special education, who works primarily with the Treatment and Education of Autistic and Related Communication-Handicapped Children ("TEACCH") method.

On June 27, 2011, M.S.'s parents wrote to the DOE, rejecting the recommended school placement, notifying the DOE that they still had not received the IEP and alerting the DOE that they intended to enroll M.S. at McCarton.  The parents received M.S.'s IEP in early July 2011.

### D.      Administrative Review

###### i.      Due Process Complaint and IHO Hearing

On August 29, 2011, the parents timely filed a due process complaint, alleging that the

DOE had failed to provide a FAPE to M.S. on 69 different grounds.  The specified grounds

included failure to develop timely critical assessment reports; failure to provide for parent

counseling and training in the IEP; failure to develop an FBA; failure to address M.S.'s

interfering behaviors; failure to develop an IEP tailored to M.S.'s needs; failure to develop goals

and objectives with the participation of M.S.'s parents; failure to address adequately M.S.'s need

for 1:1 teacher instruction; failure to verify that Horan's preferred methodology—TEACCH—

would satisfy M.S.'s needs; failure to recommend "extended-day" services for M.S.; failure to

include a general education teacher on the CSE; failure to include the parents in the selection of

M.S.'s placement school; and inappropriate placement of M.S. at Horan.  The parents sought

relief in the form of reimbursement for tuition at McCarton for the 2011-2012 school year,

including the 2011 summer session, as well as transportation expenses and home-based services,

including ABA therapy, occupational therapy and speech and language therapy.

A hearing before an IHO was held on four non-consecutive days between April 18, 2012,

and May 21, 2012.  A total of eleven witnesses testified, including individuals who served on the

CSE that drafted M.S.'s IEP.  The witnesses included Ms. Ariella Garofalo-Berger, a district

social worker and former special education teacher who served on the CSE; Janet Sencion, a

special education teacher from the Horan School who would have served as M.S.'s teacher had

M.S. attended Horan; Stacey Minondo, the director of placement for the school district; Katelyn

Salvato, a speech and language pathologist at McCarton who had worked with M.S. since

September 2011; Jessica Pangretic, also a speech and language pathologist at McCarton, who

worked with M.S. in 2007 at McCarton and again starting in September 2011 outside of the

school setting; Peter Gerhardt, Director of McCarton's Upper School; M.S.'s mother; Mildred

Ortiz, Assistant Principal of Horan; Dr. Panagiotis Rakoutis, McCarton's Director of

Occupational Therapy; Koren Brigam, an ABA therapist who had worked with M.S. since he was

twenty-two months old; and Aleida Ward, M.S.'s head teacher at McCarton.

### ii.        The IHO Decision

On July 23, 2012, the IHO issued a 42-page decision with multiple findings of fact.  In

respect of the first prong of the *Burlington/Carter* test, requiring the school to establish that it

provided a FAPE, the IHO found a FAPE denial on four grounds, including (1) failure to consider

and address M.S.'s social, emotional and behavioral needs, particularly M.S.'s self-injurious

behaviors; (2) failure to consider use of ABA methodology in light of the record, which

suggested that M.S.'s needs were met by that particular methodology; (3) failure to afford the

parents meaningful participation in the CSE meeting due to the improper constitution of the CSE,

which lacked a special education teacher with experience in a 6:1:1 classroom to explain the 6:1:1

model; and (4) inappropriate recommendation of a 6:1:1 classroom and failure to include a plan

for transitioning M.S. from 1:1 instruction to 6:1 instruction.  As to the final ground, the IHO

concluded that the assignment of a 1:1 paraprofessional did not cure the deficiency because a

paraprofessional was not required to hold a college degree, and accordingly lacked the

qualifications to address M.S.'s self-injurious and interfering behaviors.  The IHO also

considered that the DOE had failed to consider the student's needs adequately in assigning M.S.

to a 6:1 special class because it had not generated any of its own analyses or evaluations, apart

from a one-page classroom observation report, and instead had relied primarily on McCarton

reports.  The IHO found that the parents had not raised that claim in their due process complaint,

however, and accordingly declined to rule on that ground.

8

The IHO rejected the parents' claims that four other grounds contributed to a FAPE denial, including (1) the failure to provide for parent counseling and training in the IEP; (2) failure to provide for home-based services; (3) failure to conduct a placement meeting to involve the parents of M.S. in the decision to place M.S. at Horan; and (4) failure to conduct an FBA. The IHO found, however, that certain of these deficiencies violated federal law, despite the fact that they did not rise to the level of a FAPE denial.

As to the second prong of the *Burlington/Carter* test, requiring the parents to establish that their unilateral placement was appropriate, the IHO made two separate findings. First, as to the parents' placement of M.S. at McCarton, the IHO found that the placement was "appropriate, if not ideal . . . ." According to the IHO, M.S.'s matriculation at McCarton was "reasonably calculated to result in M.S.'s progress" in light of M.S.'s substantial behavioral needs and demonstrated progress at McCarton. The IHO emphasized that McCarton was "especially appropriate" in light of sexually inappropriate behaviors M.S. had developed during the 2011-2012 school year. Second, as to the parents' placement of M.S. in an after-school program, the IHO found that while the placement was "an appropriate and necessary part of [M.S.'s] special education program," it was not raised before the CSE in a timely manner and accordingly the parents failed to meet their burden under the *Burlington/Carter* test.

Finally, in respect of the third prong of the *Burlington/Carter* test, requiring the decision-maker to weigh the equities, the IHO again considered separately the equities of the placement at McCarton and the placement in an after-school program. The IHO concluded that there was no equitable basis on which to deny or limit payment of tuition at McCarton. In contrast, there was an equitable basis on which to deny reimbursement for the home-based program, namely that the parents failed to provide timely notice of the placement. Accordingly, the IHO ordered the

district to reimburse the parents for tuition at McCarton and for transportation services, and denied the parents' petition for reimbursement for home-based services.

### iii.        The SRO Appeal and Decision

Both the parents and the DOE appealed the IHO's decision.  The parents appealed the IHO's rulings that they were not entitled to reimbursement for home-based services, as well the IHO's findings that certain of the DOE's actions and omissions did not constitute a FAPE denial. The DOE cross-appealed the IHO's findings that certain of the actions and omissions of the DOE did result in a FAPE denial.

The SRO held that none of the actions or omissions of the DOE denied M.S. a FAPE and accordingly reversed those portions of the IHO decision finding a FAPE denial.  In respect of the four grounds on which the IHO found a FAPE denial, the SRO concluded that (1) the CSE had considered adequately the student's self-injurious behaviors and the BIP offered strategies that would address those behaviors; (2) the failure to consider ABA methodology did not result in a FAPE denial because New York law does not require a CSE to specify in the IEP the teaching methodology to be employed, nor did the record establish that ABA methodology was the exclusive means by which M.S. could learn effectively; (3) the IHO improperly concluded that the parents were denied meaningful participation on account of the failure to include in the CSE a special education teacher with experience in a 6:1 classroom, because the claim was not raised in the due process complaint and in any event lacked merit; and (4) the hearing record did not support the IHO's conclusion that the IEP inappropriately recommended a 6:1:1 classroom.  The SRO upheld the IHO's findings on the four remaining grounds on which the parents based their claim that M.S. was denied a FAPE.

The SRO further concluded that because neither party had appealed the IHO's findings that McCarton was an appropriate school for M.S. and that reimbursement for transportation expenses was appropriate, the rulings on those issues were final and binding.  In addition, the SRO considered the issue of mootness, which arose because at the time of the SRO's decision, M.S.'s parents had already received reimbursement for tuition at McCarton for the 2011-2012 school year due to the "pendency" provisions in IDEA.   Those provisions permit a child to "remain in [his] then-current educational placement," while administrative and judicial proceedings are pending, and requires the school to continue to finance that placement.  20 U.S.C. § 1415(j); *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 163 (2d Cir. 2004) (describing pendency provisions).  The SRO concluded that the parents' appeal had been rendered moot because "no further meaningful relief" could be granted to them, but proceeded to "review the merits" of the parents' appeal in light of recent case law holding that pendency cases present an exception to the mootness doctrine.

## III.    STANDARD

A motion for summary judgment in the IDEA context is "in substance an appeal from an administrative determination, not a summary judgment." *Lillback ex rel. Mauclaire v. Conn. Dept't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005); *accord M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative decisions.") (internal quotation marks and citations omitted)).  The task of a district court reviewing an SRO decision is to determine whether the SRO's decision is supported by "the preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim*, 346 F.3d at 380 (internal quotation marks omitted).  In evaluating the

11

sufficiency of an IEP, neither the administrative officers nor the courts may rely on "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP . . . ." *R.E.*, 694 F.3d at 186.

A district court "must give due weight to [the administrative] proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (alterations in original) (internal quotation marks and citation omitted). Accordingly, a federal court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *M.W.*, 725 F.3d at 139. "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.*, 685 F.3d at 244.

Where the IHO and the SRO reach conflicting decisions, federal courts "must defer to the reasoned conclusions of the SRO as the final state administrative determination." *M.H*, 685 F.3d at 246. "The deference owed depends on both the quality of the opinion and the court's institutional competence."[3] *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). A reviewing court may take into account "whether the decision being reviewed is well reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (internal quotation marks and

_____

[3] Plaintiffs argue that the Court should "give no deference" to the SRO's prong I findings because of the SRO's failure to comply with statutory deadlines in rendering his decision. Plaintiffs are correct that the SRO rendered his decision far past the statutory deadline. However, no authority permits courts to give less respect to SRO decisions on the basis of delay, nor is there any logical reason to do so. *Accord M.L. v. New York City Dep't of Educ.*, 13 Civ. 00574, 2014 WL 1301957, at *11 (S.D.N.Y. Mar. 31, 2014) ("Although the Court agrees with Plaintiffs that the State Review Office[r]'s routine delays in issuing decisions is problematic, it has found no authority in IDEA cases that allows it to 'declare the SRO's decision a nullity.'").

citation omitted).

To determine whether an IEP complies with the IDEA, "courts make a two-part inquiry that is, first, procedural, and second, substantive." *Id.* at 189-90. The procedural inquiry requires courts to examine "whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." *Id.* at 190 (internal quotation marks and citation omitted). Procedural violations warrant reimbursement only where the violations individually or cumulatively "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decision[-]making process,' or 'caused deprivation of educational benefits.'" *Id.* (first alteration in original) (quoting 20 U.S.C. § 20 U.S.C. 1415(f)(3)(E)(ii)).

The substantive inquiry requires courts to "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *Id.* at 190. The IDEA does not "guarantee any particular level of education," or "require that a child be provided with the optimal programmatic alternative." *C.F. ex rel. R.F.*, 746 F.3d at 72 (internal quotation marks and citation omitted). Instead, it requires "selection of a program that provides a 'basic floor of opportunity,'" and that is "likely to produce progress, not regression." *Id.* (internal quotation marks and citation omitted). Unlike procedural inadequacy, "[s]ubstantive inadequacy automatically entitles the parents to reimbursement." *R.E.*, 694 F.3d at 190.

## IV.   DISCUSSION

Plaintiff has not shown that the SRO's decision is not entitled to deference. The SRO's 55-page decision reflects a comprehensive review of the record and articulates clear explanations

for each conclusion.  It parses the parties' arguments in far greater detail than the IHO's decision and contains ample citations to the record in support of each finding.  Because "[c]ourts generally 'defer to the final decision of the state authorities'" if the decision is "thorough and careful," *M.H.*, 685 F.3d at 241 (citation omitted), and because the SRO's findings are supported by a preponderance of the evidence, the SRO's decision is entitled to deference.

###    A.    Procedural Violations

The parents allege two procedural violations: (1) failure to conduct an FBA and, relatedly, failure to address M.S.'s self-injurious behaviors in the BIP and IEP; and (2) failure to provide for parent training.  However, a preponderance of the evidence supports the SRO's findings that neither alleged violation caused a deprivation of educational benefits or impeded M.S.'s right to a FAPE or the parents' opportunity to participate in the decision-making process.  Therefore, the DOE did not violate Plaintiffs' procedural rights resulting in a FAPE deprivation.

###        i.        Failure to Provide an FBA and to Address Self-Injurious Behaviors

The SRO properly upheld the IHO's finding that the failure to conduct an FBA did not rise to the level of a FAPE deprivation and correctly reversed the IHO's finding that the alleged failure to identify M.S.'s self-injurious behaviors resulted in a FAPE deprivation.

The failure to conduct an FBA does not render an IEP legally inadequate so long as the school district "'consider[s] the use of positive behavior interventions and supports, and other strategies' when a child's behavior impedes learning."  *M.W.*, 725 F.3d at 140 (citation omitted); *R.E.*, 694 F.3d at 190 ("when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors.").

The IHO considered that the failure to provide an FBA did not constitute a FAPE denial because "there is no absolute requirement that a FBA be performed."  He concluded that the

14

McCarton reports relied upon by the CSE sufficiently enabled the CSE to devise a BIP that would provide a basis to address M.S.'s maladaptive behaviors, particularly where at least one of those reports was based on a previously conducted FBA.  The IHO separately considered the parents' claim that the failure to identify M.S.'s self-injurious behaviors in the IEP constituted a FAPE denial.  In a two-paragraph analysis, he concluded that this omission contributed to the denial of a FAPE because the CSE was aware of M.S.'s self-injurious behaviors and the fact that those behaviors were triggered by transitions, yet provided no guidance in the IEP as to "how to handle the situation."

In contrast, in a lengthy and well-reasoned analysis, the SRO upheld the IHO's finding that the failure to conduct an FBA did not result in a FAPE denial, but reversed the IHO's finding that the failure to identify M.S.'s self-injurious behaviors contributed to a FAPE denial.  The SRO reasoned that despite the lack of a formal FBA, the record indicated that the CSE considered the factors that impeded M.S.'s learning, including behaviors that could be described as self-injurious, and adequately addressed those factors in the IEP and BIP.  In reaching this conclusion, the SRO relied on testimony at the hearing establishing that the CSE considered the "intensity, frequency, [and] duration of some of [M.S.'s] behaviors," including M.S.'s practices of throwing himself to the ground, hollering, screaming, property destruction, laughing and verbal perseveration, lack of attention to tasks, tantrums and self-injurious behavior.  The SRO noted that the BIP specifically addressed each of those behaviors, outlined strategies to address them and identified expected changes in the student's behavior.  In addition, the SRO concluded that M.S.'s interfering behaviors, including his self-injurious behaviors, were adequately addressed in the IEP itself, which "incorporated supports to assist the student in changing his behavior, including a 1:1 behavior management paraprofessional."  To ensure "full compliance with all of

15

the formal procedures," however, the SRO directed the CSE to conduct an FBA if it had not yet done so.

The record fully supports the SRO's findings.  It establishes that the CSE considered M.S.'s interfering behaviors and strategies to address those behaviors, despite the fact that it did not conduct a formal FBA or specifically identify M.S.'s behaviors as "self-injurious."  The district social worker testified that an "informal" FBA was conducted at the CSE meeting in order to draft the BIP.  She observed that it "would have been better to include [in the BIP] the self-injurious behaviors" exhibited by M.S., but noted that "tantruming," which was addressed in the BIP, could include self-injurious behaviors.  M.S.'s mother confirmed that M.S.'s inappropriate behaviors, including his self-injurious behaviors, were discussed at the CSE meeting, and the director of McCarton Upper School testified that the goals within the IEP were "certainly" appropriate to meet M.S.'s needs.

Accordingly, Plaintiffs' claim that the DOE's failure to conduct a formal FBA and the related failure to address M.S.'s self-injurious behaviors resulted in a FAPE denial is rejected.

### ii.    Failure to Include Parental Training

The SRO's and IHO's finding that the failure to provide for parent counseling and training did not rise to the level of a FAPE deprivation is supported by a preponderance of the evidence.  Failure to provide parent counseling may constitute a procedural violation, but "ordinarily does not result in a FAPE denial or warrant tuition reimbursement."  *M.W.*, 725 F.3d at 142; *accord T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 170 (2d Cir. 2014) (holding that "parent counseling and training as part of [the student's] ESY program was not a sufficiently serious procedural violation to deny [the student] a FAPE.").

16

The IHO found that the failure to provide for parent training was a procedural violation but concluded that it did not rise to the level of a FAPE denial because it did not prevent the parents from meaningfully participating in devising the IEP, nor did it appear from the record that the parents raised the issue at the CSE meeting.  In reaching his conclusion, the IHO credited testimony that parent training was part of the Horan program.

The SRO agreed with the IHO, concluding that "even acknowledging that the May 2011 CSE's failure to recommend parent counseling and training violated State regulations, the hearing record ultimately supports the conclusion that this violation, alone, did not impede the student's right to a FAPE, significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or cause deprivation of educational benefits to the student."  The SRO also observed that testimony at the hearing confirmed that parent counseling was "programmatically embedded" in the district and so would have been automatically included in the program into which M.S. was placed.

The SRO correctly found that the failure to provide for parent counseling and training did not rise to the level of a FAPE violation, notwithstanding improper reliance on "retrospective testimony" concerning the district's programmatic parent counseling.  The sufficiency of an IEP must be judged on its face, and "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a *Burlington/Carter* analysis."  *R.E.*, 694 F.3d at 186.  The testimony that parent counseling was "programmatically embedded" in the district's curriculum constitutes "retrospective evidence" and accordingly should not have been relied upon by the SRO to cure any deficiency in the IEP. Even discounting this evidence, the record does not establish that the failure to provide for parent counseling impeded M.S.'s right to a FAPE, caused a deprivation of educational benefits, or

prevented the parents from meaningfully participating in the decision-making process.  M.S.'s

mother attended the CSE meeting where M.S.'s IEP was developed and actively participated in

its development.  In particular, she testified that the CSE committee "discussed [M.S.'s]

inappropriate behaviors at the time of the [CSE] meeting," as well as his "needs and deficits," and

her "concerns about [M.S.]."  The CSE meeting minutes likewise indicate that M.S.'s mother

voiced her concerns and opinions and that the other members of the CSE took her views into

account.  The meeting minutes indicate, for example, that the CSE discussed the possibility of

sending M.S. to a community school, but rejected the idea because "[M.S.'s mother] stated that

this would be a goal but he is not ready yet."

      The SRO's finding that the failure to include parent training in the IEP did not rise to the

level of a FAPE denial is accordingly upheld.  Plaintiffs' claim that the failure to include parent

counseling in the IEP constituted a FAPE deprivation is rejected.

      **B.**      **Substantive Violations**

      Plaintiffs allege four substantive violations of the IDEA.  First, they argue that the IEP

inappropriately placed M.S. in a 6:1:1 program that was not sufficient to meet M.S.'s needs.

Second, they argue that the IEP should have specified the use of ABA methodology.  Third, they

allege that the DOE failed to establish that the school placement it offered M.S. was appropriate.

In particular, Plaintiffs assert that the witnesses from the Horan School "failed to explain how the

even inadequate behavioral interventions in [M.S.'s] IEP would be addressed at their school."

Finally, Plaintiffs allege that the DOE failed to include in the IEP provision for after-school

services.[4]  Because the alleged substantive violations are either unsupported by the record or are

---

[4] Plaintiffs' papers do not allege that the failure to provide for after-school services constituted a
FAPE denial, and thus appear to bypass prong I of the *Burlington/Carter* test.  Instead Plaintiffs
claim that their placement of M.S. in afterschool services was appropriate under prong II.
Because a determination of the appropriateness of a unilateral placement is proper only if the

not properly before the Court, Plaintiffs' claims that the DOE committed substantive violations of the IDEA, thereby denying M.S. a FAPE, are rejected.

### i.        Inappropriate Placement in Class with 6:1:1 Instruction

The SRO properly rejected the IHO's finding that the DOE inappropriately placed M.S. in a 6:1:1 classroom.  Under New York law, "[t]he maximum class size for special classes containing students whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention, shall not exceed six students, with one or more supplementary school personnel assigned to each class during periods of instruction."  8 N.Y. Comp. R. & Regs. tit. 8, § 200.6(h)(4)(ii)(a).  Courts in this district have reasoned that "[w]ithin the general parameters of 8 N.Y.C.R.R. § 200.6, class size and student-teacher ratios 'involve questions of methodology more appropriately answered by the state and district decision-makers' than by federal judges."  *M.L. v. New York City Dep't of Educ.*, No. 13 CV 00574, 2014 WL 1301957, at *11 (S.D.N.Y. Mar. 31, 2014) (quoting *D.J. v. New York City Dep't of Educ.*, 12 Civ. 7009, 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013)).

The IHO's two-page determination on this claim turned on his observation that "no evidence was obtained by the CSE indicating that [M.S.] no longer required the substantial 1:1 instruction he was receiving at McCarton . . . ."  The IHO summarily concluded that the assignment of a 1:1 paraprofessional to M.S. did not satisfy M.S.'s need for 1:1: instruction because a paraprofessional lacked the educational background to address M.S.'s self-injurious and interfering behaviors.

---

Court determines that the IEP failed to provide a FAPE under prong I, the Court construes the claim as a further challenge to the substantive adequacy of M.S.'s IEP.  This approach is consistent with the claim as pleaded by the parents in their due process complaint and as evaluated by the IHO and the SRO.

In contrast, in a well-reasoned decision with ample citations to the record, the SRO found that the lack of a 1:1 teacher in the IEP did not rise to the level of a FAPE denial because the IEP was sufficiently individualized to meet M.S.'s intensive management needs.  In reaching that conclusion, the SRO relied on the following evidence:  (1) M.S. had been placed the previous year in a classroom with five students, a head teacher, and four assistant teachers and received daily instruction in both individual and small group settings, indicating that M.S.'s previous experience was not limited to 1:1 instruction; (2) M.S. had worked with a paraprofessional at McCarton who had successfully redirected M.S.'s attention when necessary while M.S. was participating in group instruction; (3) M.S.'s head teacher at McCarton testified that M.S. was able to participate in group instruction for approximately twenty minutes as long as he had verbal reminders to refocus; and (4) progress reports indicated that M.S. had successfully participated in speech-language group instruction.

The SRO similarly found that there was nothing in the hearing record "to suggest that the student would not be adequately supported by a 1:1 paraprofessional working under the direction of the special education teacher . . . ."  Specifically, the SRO observed that a primary purpose of the paraprofessional was to "prompt" the student by redirecting his attention while the student was participating in group instruction and the paraprofessional was always subject to the supervision of a licensed, advanced-degree-holding individual.  The SRO took into account "the parents' and McCarton staff's viewpoints that M.S. should receive instruction solely on a 1:1 basis," but concluded that "this amounts to conflicting viewpoints among educators over the best manner in which to deliver special education instruction and services to the student."

The record fully supports the SRO's conclusion.  The meeting minutes memorializing the CSE meeting indicate that the CSE was fully cognizant of M.S.'s substantial management needs

and the IEP was designed to meet those needs, in particular by adding a 1:1 paraprofessional who could redirect M.S.'s attention when necessary.  For example, the CSE minutes note that "12 or 8 students would be too distracting for him / 6 students and 1 special ed teacher with para/ and one-to-one para would be closest to McCarton school – team agrees this is appropriate for [M.S.]." The IEP also noted that "[i]n group, [M.S.] continues to require redirection for attending as [M.S.'s] internal/external distractions make it difficult for him to focus."  Witness testimony further established that M.S. had successfully worked in group settings in the past, as observed by the SRO.  For example, M.S.'s former speech therapist testified that she had seen progress in M.S.'s ability to "process language with distraction with other students in the room, waiting his turn and being able to attend to other students . . . ."  Finally, in regard to the ability of a paraprofessional to manage M.S.'s behavioral needs adequately, testimony in the record indicated that paraprofessionals are informed about the substance of IEPs and the student's management needs "in order for them to be more aware what kind of reinforce[ment] or supervision they should be giving to students . . . ."

As the SRO correctly observed, conflicting evidence was presented by certain of M.S.'s witnesses.  The Director of McCarton's Upper School, for example, testified that he was "of the opinion that Mitchell still requires direct one-on-one support."  He did not, however, address whether the one-on-one support could be provided by a paraprofessional, rather than a teacher. *See F.L. ex rel. F.L. v. New York City Dep't of Educ.*, 553 F. App'x 2, 8 (2d Cir. 2014) (summary order) (affirming finding that student was not denied a FAPE where IEP proposed 6:1 class with 1:1 paraprofessional and "McCarton teachers uniformly testified that [the student] can only learn in a 1:1 setting [but] they did not explain why this could not be effected through 1:1 instruction by a supervised behavioral management paraprofessional.").

In view of the SRO's carefully reasoned decision and the weight of the evidence, deference to the SRO's decision is appropriate.  Accordingly, Plaintiffs' claim that the SRO improperly reversed the IHO's decision regarding 1:1 instruction is rejected.

### ii.   Use of ABA methodology

The SRO properly rejected the IHO's finding that the failure to consider ABA methodology in the IEP contributed to a FAPE denial.  "It is well established that once an IEP satisfies the requirements of the Act, questions of educational methodology may be left to the state to resolve."  *K.L. ex rel. M.L. v. New York City Dep't of Educ.*, 11 Civ. 3733, 2012 WL 4017822, at *12 (S.D.N.Y. Aug. 23, 2012), *aff'd,* 530 F. App'x 81 (2d Cir. 2013).  Further, "parents are not entitled to choose an educational methodology under the IDEA . . . ."  *F.L. ex rel. F.L. v. New York City Dep't of Educ.*, 11 Civ. 5131, 2012 WL 4891748, at *9 (S.D.N.Y. Oct. 16, 2012) *aff'd*, 553 F. App'x at 2.

The IHO found that the failure to consider the need for ABA methodology constituted a further FAPE denial; the IHO stopped short of concluding that ABA methodology should have been included in the IEP.  The IHO's ruling was grounded on his assertion that "a School District is prohibited from refusing to consider a particular methodology of instruction when a student's individual needs require it."  With little citation to the record, the IHO concluded that there was "apparently no specific discussion at the CSE meeting regarding what methodology would be employed in the 6:1:1 class, and significantly, the student's possible need for continued instruction in ABA was not considered."

The SRO reversed the IHO's finding and concluded first that New York law does not require an IEP to specify the teaching methodology to be employed.  In addition, the SRO addressed the merits of the issue and found that the record did not establish that M.S. "could only

22

make progress when instructed using ABA."  In particular, the SRO credited the district social

worker's testimony that she did not believe that ABA was the "exclusive" means by which to

teach the M.S. effectively.  The SRO further concluded that the hearing record demonstrated that

principles of ABA methodology were incorporated in the 6:1:1 special classroom identified in

M.S.'s IEP.  The SRO also took note of the testimony of the director of McCarton Upper School,

who opined that ABA was superior to TEACCH, but appeared to place little weight on that

testimony.

The SRO's finding is supported by a preponderance of the evidence.  The record clearly

establishes that M.S. responded well to ABA.  For example, M.S.'s mother testified that ABA

"has been really working for [M.S.]" and the McCarton School director testified that M.S. was

"very responsive" to ABA methodology.  The SRO correctly observed, however, that no witness

testified that ABA was the exclusive means by which M.S. could learn effectively.  In addition,

multiple witnesses testified that TEACCH and ABA both employed strategies that are "amenable

to [the] highly structured, predictable learning environment" required by M.S.  Accordingly,

Plaintiffs' argument that the failure to consider or require ABA methodology in M.S.'s IEP

resulted in a FAPE denial is denied.

###### iii.      Inappropriate School Placement

The SRO correctly found that the parents' contention that the assigned school did not meet M.S.'s needs should not be considered.  Parents may not rely on "[s]peculation that the school district will not adequately adhere to the IEP" as a basis for unilaterally placing their child in an alternative school.  *R.E.*, 694 F.3d at 195.  "A challenge[ ] [to] the DOE's choice of school, rather than the IEP itself" is appropriate only in "a later proceeding to show that the child was denied a free and appropriate education because necessary services included in the IEP were not provided in practice."  *F.L. ex rel. F.L.*, 553 F. App'x at 8.

The IHO did not issue a finding as to the appropriateness of the recommended placement, observing only that "the record is not clear regarding whether the placement at [the Horan School] would be unable to meet IEP mandates."  The SRO nevertheless stated that "the IHO erred in reaching the parents' contentions about the assigned school since such analysis would require the IHO—and an SRO—to determine what might have happened had the district been required to implement the student's May 2011 IEP."  The SRO further found that "[e]ven assuming for the sake of argument that the student had attended the district's recommended program . . . the evidence in the hearing record does not support the conclusion that the district would have deviated from the student's IEP in a material or substantial way."

Because the SRO correctly concluded that a challenge to the DOE's choice of school is improper where the student never attended the school, the Court need not reach the merits of the claim, and the SRO's ruling that the school placement did not result in a FAPE denial is upheld.

###### iv.      Failure to Include Home-Based Services

The SRO and the IHO properly rejected Plaintiffs' claim that the failure to provide for home-based services resulted in a FAPE denial.  The IHO concluded that the failure to consider

continuation of extended-day services was "inappropriate," but did not constitute a FAPE denial "in and of itself."  The IHO observed that the need for home-based services was not presented at or before the CSE meeting as a continuing necessity for M.S., and the reports the CSE relied upon did not include recommendations for home-based services.

In a thoroughly reasoned decision with extensive record citations, the SRO upheld the IHO's finding.  After canvassing the substantial witness testimony on the issue, the SRO concluded that the primary purpose of M.S.'s home-based services appeared to be "generalization" of behaviors learned in the school setting to the home setting.  In particular, the SRO noted that M.S.'s home-based ABA therapist, M.S.'s speech-language therapist from McCarton and M.S.'s mother all testified to the behavior generalization achieved through home-based services.  The SRO concluded that "the evidence does not suggest that the student required home-based programming . . . in order to avoid regression, make progress during the in-school portion of his program, or to enable [M.S.] to receive educational benefits."

The SRO's findings are supported by a preponderance of the evidence.  The SRO correctly noted the testimony of several witnesses that the purpose of home-based services was to "generalize" conduct learned at school, as opposed to providing an additional tool or management skill.  For example, a speech and language pathologist who had worked with M.S. at McCarton stated that the extra speech therapy she provided was "just a good chance for [M.S.] to generalize the skills in a different setting with different people."  Another speech and language pathologist who worked with M.S. at McCarton confirmed that M.S. required additional speech and language therapy sessions for generalization but also stated that generalization was addressed "during the school day."  At least one witness, however, expressed concern that M.S. risked regressing without home or outside services.  The witness, M.S.'s longtime ABA therapist, testified that she

has "been working with him since he was 22 months old . . . [and M.S.] always had after school and weekend[] [services]" and that M.S.'s "maladaptive behaviors would increase if he no longer received after school assistance." The SRO did not reference this testimony. In view of the weight of the evidence and the deference owed a well-reasoned SRO decision, however, the SRO's decision is affirmed.

Plaintiffs emphasize that M.S. required home-based services also to address his "inappropriate sexually-oriented behaviors." M.S.'s mother, however, testified that those behaviors were not discussed at the CSE meeting because they did not manifest until "this past school year." Because an IEP "must be evaluated prospectively as of the time of its drafting," *R.E.*, 694 F.3d at 186, any claim that the IEP was deficient because it did not address M.S.'s as-yet unmanifested behaviors fails. Accordingly, Plaintiffs' claim that the failure to include home-based services in the IEP resulted in a FAPE denial is rejected.

The SRO's ruling that the DOE met its burden of showing that the IEP provided a FAPE to M.S. under the first prong of the *Burlington/Carter* test is supported by a preponderance of the evidence. Consequently, the Court does not reach the parties' arguments under the second and third prongs of the *Burlington/Carter* test.

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED. The Clerk is directed to close the motions at Docket Nos. 28 and 34 and to close the case.

SO ORDERED.

Dated: July 24, 2014
       New York, New York

26

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE